# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHARON A. NICELY,      )
                        )
          Plaintiff,      )
                        )    **MEMORANDUM OPINION**
       v.              )    **AND RECOMMENDATION**
                        )
UNUM LIFE INSURANCE    )    1:08CV509
COMPANY OF AMERICA,    )
                        )
         Defendant.    )

      This case arises from a dispute between Plaintiff Sharon A. Nicely ("Plaintiff or "Ms. Nicely") and Defendant Unum Life Insurance Company of America ("Defendant" or "Unum") concerning the denial of long-term disability benefits and the waiver of life insurance premiums based on group policies issued by Defendant. This matter is presently before the court on the cross-motions for summary judgment: Plaintiff's Motion for Summary Judgment (docket no. 19) and Defendant's Motion for Summary Judgment (docket no. 16). Because the parties have not consented to the jurisdiction of a magistrate judge, the court must deal with the dispositive motions by way of a recommended disposition. For the reasons set forth below, it will be recommended that Plaintiff's Motion for Summary Judgment be denied, and that Defendant's Motion for Summary Judgment be granted.

## I. FACTS

The facts underlying the administrator's decision and the administrative appeal are largely undisputed and will be summarized as briefly as possible.[1] Ms. Nicely began her employment with Autumn Corporation in June 1991 and worked as a Regional Quality Assurance Nurse ("RQAN") for the western region of North Carolina. She was responsible for developing and implementing policies and procedures to ensure that all nursing practice standards at Autumn's western facilities[2] complied with the guidelines of the North Carolina Board of Nursing as well as other state and federal guidelines. Ms. Nicely was a salaried employee, earning $90,000 a year. (R. 38; 432.)

Plaintiff's job duties are detailed in Autumn's eight-page job description and other documents. (R. 119-26; 460-69; 475-87.) The job description requires, among other things: (1) good physical and mental health; (2) the ability to function appropriately under pressure and stress and cope with management responsibilities; (3) visual and aural acuity to detect changes in patient's conditions as well as changes in staff's attitudes or actions that signal potential problems; (4) a keen

---

[1]  Both parties cite extensively to the medical records which are contained in the administrative record, attached to Defendant's motion for summary judgment as Exhibit A (administrative record on LTD claim) and B (administrative record on life waiver claim). Unless otherwise noted in this recommendation, I will refer to the records by page number, referencing Ex. A, which is where most of the pertinent records are found. The page numbers correspond to the numbering in the original document.

[2]  These eight, long-term nursing facilities were located in Forest City, Saluda, Waynesville, Marion, Morgantown, Statesville, Mocksville, and King.

memory for details; (5) the ability to comprehend and utilize good management skills, communication, problem-solving, decision-making, supervision, organization, planning, goal-setting, delegating, evaluating, motivating, and listening; and (6) the ability to do long-distance driving and stay overnight frequently. (R. 122-23.) Plaintiff's last day of work was April 15, 2004.

The record reflects that Plaintiff's medical saga began in February 2004. On February 25, 2004, she was examined by Dr. Timothy Martin, an ophthalmologist, complaining of pressure and stabbing pain in her right eye, exacerbated by light, with uneven pupil size. Dr. Martin administered cocaine eye drops to test for Horner's syndrome. (R. 129.) Later that day, Plaintiff was seen in the emergency room for an allergic reaction to the eye drops. (R. 276.) The following day, Plaintiff was hospitalized after returning to the emergency room complaining of eye pain, headache, and neck and shoulder pain. (R. 254.) An MRI of the brain and magnetic angiography of her head and neck were normal; Plaintiff refused a lumbar puncture and rejected a diagnosis of possible migraine headache. (R. 239.) Later, Plaintiff said her headache was totally resolved but that she was having low back pain. (R. 255.) She "refused fundoscopic examination secondary to photophobia." (*Id.*) Plaintiff was discharged on February 27, 2004, she was told that she could resume her normal activities, and she was advised to establish a relationship with a primary care physician for her low back complaints. Plaintiff objected to her discharge

because she did not feel that her "acute back pain" was "treated appropriately." (R. 250.)

On March 3, 2004, Plaintiff was examined by Dr. Sandhya Kumar, a neurologist. (R. 301.) Plaintiff complained of a headache around her right eye with photophobia. The neurological exam was "unremarkable" (R. 304) though her pupils were no longer asymmetrical and she had decreased sensation with tingling on the right side of her head. Dr. Kumar stated that "differential diagnoses include cluster headaches with associated Horner syndrome, Raeder's trigeminal neuralgia, however, given the unremarkable brain MRI and the absence of the finding now, it is more likely related to cluster headaches." (R. 303.) Dr. Kumar prescribed several different medications for headache pain and prevention. (R. 304.)

Plaintiff next saw Dr. Kumar on March 17, 2004, and reported headaches "that do not resolve." (R. 306.) She told the doctor that her headaches were worse in fluorescent light and that the pain was always behind her right eye. (*Id.*) She also reported an odd sensation in her right thumb several days earlier, and later experienced tremors in her right forearm and a peculiar "crawling sensation." (*Id.*) She reported that she had significant stressors in her life, including her mother having recently been diagnosed with Alzheimer's, her father-in-law's recent death, and her husband having a brain hemorrhage. (R. 306-07.) Dr. Kumar prescribed Neurontin and scheduled a cervical MRI. (R. 307.)

-4-

On March 26, 2004, Plaintiff was seen by Dr. Martin, who noted that she was "remarkably better than before," though Plaintiff reported that she continued to experience pain in her right eye and could not tolerate fluorescent light. (R.132.) On April 14, Plaintiff returned to Dr. Kumar, reporting that her headaches had decreased in intensity and frequency, and that she usually could treat them with Midrin, or sometimes Tylenol or Advil. She reported continued soreness of her scalp and face and right upper extremity numbness and tingling. Plaintiff also told Dr. Kumar that the increased dosage of Neurontin caused her to be "sluggish" in the afternoon and that she thought her cognition might be slowed. (R. 312.) Dr. Kumar stated that Plaintiff's "speech is fluent, comprehensive" and that "[a]ttention and concentration," and "[n]aming and repetition" were "intact." (*Id.*) More tests were scheduled. Dr. Kumar noted no restrictions or limitations on Plaintiff.

Plaintiff's last day of work was the next day, April 15, 2004; she contends that she was not allowed to return to work because of Autumn's concerns for patient safety if she cared for patients while she was taking Neurontin. (R. 95, 183, 328.) Since the onset of her symptoms in February 2004, Plaintiff missed three days of work in February 2004, twenty days in March 2004, and five days of scheduled work in April 2004. (R. 111; 116.)

Further tests performed in April 2004 yielded normal results. An electrodiagnostic report stated: "[t]here is no evidence for a right upper extremity

-5-

radiculopathy, right median neuropathy or right ulnar neuropathy on today's study. One might consider right lateral epicondylitis [an elbow problem]." (R. 318.) The report also noted that Plaintiff's recent MRI "only showed some evidence of mild degenerative changes at C5-6 and C6-7." (R. 317.)

On April 30, 2004, Plaintiff began physical therapy for her upper extremity symptoms. The therapy notes suggested that Plaintiff's Horner's syndrome symptoms were "largely resolved" and that Plaintiff reported that her shoulder and hand symptoms were "not consistently aggravated by functional activity." Plaintiff reported some paresthesias "during and after long drives and while she helps her husband who suffered a recent back injury with transfers." (R. 321.) Plaintiff's goals for therapy included being able to drive for work purposes. (R. 322.)

On May 17, 2004, Plaintiff had a follow-up appointment with Dr. Martin. Plaintiff reported that fluorescent light still bothered her and her right eye still got tired, but she was not having as many migraine symptoms. (R. 133.) Dr. Martin noted that, with regard to Horner's syndrome, Plaintiff was "doing better." (*Id.*) On May 21, 2004, Plaintiff returned to Dr. Kumar, reporting that her headaches were better, but not fully resolved. She reported that she was taking 700 mg of Neurontin daily and that it was helping control her pain but she was having difficulty with her memory and speech. Dr. Kumar's impression was "history of Horner's syndrome but with unremarkable imaging studies and probably related to cluster headaches," and

-6-

cervical degenerative disease. She noted that "speech is without dysarthia,"[3] but that Plaintiff "seems to pause at times." (R. 158.) Dr. Kumar and Plaintiff discussed tapering and discontinuing Neurontin, if she continued to have cognitive difficulties after physical therapy was completed. Dr. Kumar reported no work restrictions or limitations. (R. 159.)

On May 28, 2004, Ms. Nicely notified Dr. Kumar's office by phone that May 26, 2004, had been her last day of physical therapy, and she received a prescription and Neurontin tapering instructions from Dr. Kumar. (R. 442.) On June 2, 2004, Autumn terminated Plaintiff's employment. (R. 96.)

On June 18, 2004, Plaintiff called Dr. Kumar's office to report that she experienced two bad headaches after decreasing her Neurontin and was afraid to reduce the dosage any more. She was advised to return to her original dosage. (R. 440.)

On June 21, 2004, Dr. Kumar completed an Attending Physician's Statement ("APS") in which she noted that Plaintiff had Horner's syndrome, trigeminal neuralgia, cluster headaches, and cervical degenerative disc disease. Under the heading "Restrictions," Dr. Kumar wrote: "[p]atient reports that her pain is much improved on Neurontin, but has cognitive difficulties as a side effect and hence any job which would require mental thinking and judgment." (R. 43.) Under "Limitations,"

---

[3] Dysarthia is defined as "difficulty in articulating words due to disease of the central nervous system." *See* Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/dysarthia.

Dr. Kumar indicated "same as above." She also checked a box indicating that Plaintiff had not been released to return to her own occupation. (*Id.*)

On June 23, 2004, Plaintiff spoke with Joy Strickland, the Disability Benefits Specialist handling Plaintiff's claim at Unum. Plaintiff reported that she "went back to work and had a terrible time adjusting to fluorescent lights. Her pupil was constricting." (R. 95.) Plaintiff stated that she could not brush her hair and that she had pain on her right side when taking a shower. (*Id.*) She also informed Ms. Strickland that she had worked some in February and March but that she had used up all her FMLA days and "her boss told her that he did not want her working as long as she was on [Neurontin] because she could harm a patient." She continued to complain of cognitive problems which she said her doctors attributed to the Neurontin. Plaintiff reported that she had not undergone any cognitive testing as of that date. (R. 97.)

On July 7, 2004, Plaintiff advised Ms. Strickland that she was still having memory problems but that it was "a day to day thing," and that "[i]t's the stupid things that she does." She reported that she was still sensitive to light and that she could not reduce her Neurontin dosage because the pain returned at the lower dosage. Plaintiff said that Dr. Kumar had suggested a nerve block, but that her husband's spine specialist had recommended otherwise because it would be a temporary solution. (R. 183-84.)

-8-

On July 29, 2004, Plaintiff called Ms. Strickland to inquire about the status of her claim. She reported that she was not doing well and was having headaches. At the time of the phone call, Plaintiff was out of town with her mother, and she did not have her medication with her. Ms. Strickland noted that Plaintiff's speech was slower than usual. (R. 192.) Plaintiff called again on August 10, 2004, and told Ms. Strickland that her Neurontin dosage had been increased to 900 mg per day because her symptoms had returned, and that she was no longer driving because she did not feel safe doing so while taking Neurontin. (R. 212.) On August 18, 2004, Ms. Strickland called Plaintiff to update her on the status of her claim. There was a misunderstanding about some forms Plaintiff had sent in, which caused Plaintiff to get upset, but by the end of the call Plaintiff apologized and "[t]he call was ended cordially." (R. 333.)

Plaintiff initially requested a medical review on July 7, 2004 (R. 202), and the medical records were summarized. (R. 150-51.) The review was suspended to obtain further information from the employer Autumn regarding the date through which Plaintiff was paid her regular salary, which would be treated as the claimed date of disability. (R. 202.) After that information was received, Unum determined that the appropriate claimed date of disability should be April 15, 2004. (R. 12.)

On August 19, 2004, Plaintiff reported to Dr. Kumar that her headaches were under control on Neurontin, but that approximately three weeks earlier she had begun experiencing more pain and noticed eyelid drooping and pupil asymmetry.

-9-

(R. 435.) On the increased Neurontin dosage, Plaintiff was having fewer migraines; however, she reported that she continued to have memory difficulties, including slow thinking, delay in responding to questions, and difficulty following directions. She told Dr. Kumar that when she had a headache, she had to take Midrin and lie down. Physical examination revealed "significant photophobia and . . . significant difficulty looking out of the other fundus." (*Id.*) Dr. Kumar advised Plaintiff to gradually increase her Neurontin dosage from 900 mg to 1200 mg. (*Id.*)

The file was referred for medical review on August 24, 2004, and RN Glenda Lawson prepared a summary of the claim information and medical history. (R. 346.) Ms. Lawson noted that when Plaintiff stopped working on April 15, 2004, she had not voiced any complaint about Neurontin and "it is unclear why she stopped working at that time." (R. 348.) She observed that Plaintiff's cervical spine symptoms had not altered her activities and that she had reported helping her husband with transfers. Ms. Lawson noted the side effects of Neurontin, including drowsiness and slurred speech, but stated that "these can be resolved by dosage adjustments or medication changes." (*Id.*) Plaintiff's medical records were then reviewed by Dr. Tony Smith, who also summarized the medical information. Dr. Smith noted the essentially normal multiple test results and neurological exams, that the records contained "no testing or exams to support a deficit in mental thinking or judgment" and that "[t]esting to date has not demonstrated or documented a functional deficit that would preclude the ability to work." (R. 349.)

-10-

By letter dated September 27, 2004, Unum notified Plaintiff that it had denied her claim. (R. 361.) The letter noted Plaintiff's intention to return to work part-time on April 27, 2004, which was not permitted by her employer. It also noted that the Horner's syndrome was "resolving," Plaintiff's degenerative disc disease was being treated by physical therapy, her headaches were improving, and there were multiple normal neurological exams and imaging studies. The letter also noted that there were two normal electroneurological studies, and Plaintiff's cognitive complaints were unsupported by testing. (R. 363.) In two separate phone calls to Unum in September and October 2004, Plaintiff stated that she intended to appeal.[4]

On October 27, 2004, Plaintiff told Dr. Kumar that her headaches were significantly better on the increased Neurontin dosage, that fluorescent lights were a significant headache trigger, and that her main difficulty was cognitive. She reported "significant difficulty with slowness in thought processing, slowness of speech, lightheadedness, misspelling words." She denied being depressed, despite several psychosocial stressors. Dr. Kumar observed Plaintiff's speech was "slow at times and she pauses to get her words out but it appears to be comprehensive." She also had photophobia on fundoscopic examination. (R. 432.) Dr. Kumar believed the cognitive difficulties could be related to both the medication and

---

[4] By letter dated December 16, 2004, Unum denied the life waiver of premium claim as well. (Ex. B at 263.)

elements of depression. Dr. Kumar referred Plaintiff for a neuropsychological evaluation. (*Id.*)

On November 11, 2004, Plaintiff was examined by Cecile E. Naylor, Ph.D., a neuropsychologist at Wake Forest University School of Medicine. The results showed average cognitive performance "with marked slowing." Tests also indicated weak memory functioning, "particularly for verbal materials." Dr. Naylor noted that Plaintiff's reaction times were "extremely slow." Dr. Naylor made the following clinical observations:

> Clinically, we observed the patient to be pleasant and cooperative. She worked diligently and put forth good effort in the completion of this evaluation. Ms. Nicely attempted all that was asked of her and she did so without complaint. She worked slowly and carefully. Ms. Nicely remained attentive to tasks and did not require redirection from the examiner. She did request that the florescent lights be turned down and explained that the glare from the lights caused headaches for her. During part of the evaluation, Ms. Nicely wore sunglasses to help with the glare from the lights and the computer screen. She interacted with the examiner in a polite fashion. At one point, Ms. Nicely appeared somewhat distressed about her test performance. Qualitatively, she had some difficulty expressing herself on a vocabulary measure.

(R. 457.) Dr. Naylor concluded:

> In summary, the findings document gross slowing of cognitive skills as well as mild reduction in auditory verbal memory, organization, and word finding. Affective distress is a major factor, and the chronic pain undoubtedly serves to exacerbate physical and cognitive symptoms as well. Certainly the most handicapping deficit from a cognitive perspective is the extreme slowing. This would make it very difficult for her to perform any job effectively. However, if the pain and physical symptoms could be controlled, and processing speed were to improve, cognitive skills would likely be adequate.

(*Id.*)

-12-

Plaintiff was examined again by Dr. Martin on November 22, 2004, with complaints of continued photophobia with cluster headaches. (R. 491.) On February 24, 2005, Plaintiff again saw Dr. Kumar and reported sharp shooting pain along the right jaw line in a V2 distribution which was excruciating and which occurred without warning. (R. 426-27.) To alleviate the pain, Plaintiff would put her head down, close her eyes, take deep breaths, and attempt to relax. She reported that these episodes occurred four to five times a month, lasted a few minutes, and resolved spontaneously. She also reported continued headaches, sensitivity to light, and pupil constriction. Plaintiff was taking 1400 mg of Neurontin per day, together with Verapamil, Midrin, and Wellbutrin. Dr. Kumar noted "marked photophobia on fundoscopic examination" and a "history of Horner's Syndrome and associated headaches, and likely trigeminal neuralgia . . . . She also has complained of cognitive deficits which may be related to medication as well as a component of depression . . ." (*Id.*)

By letter from counsel dated May 11, 2005, Plaintiff appealed the denial of her claim. (R. 401.) She submitted additional materials, including medical records, a neuropsychological report, letters from Plaintiff, her husband, and her tax professionals, job performance evaluations, photographs, and a written job description. In his letter, Plaintiff's counsel stated that Ms. Nicely's job of supervising nursing staffs at eight facilities required compliance with nursing home regulations,

-13-

that the job was "extremely demanding," and that the November 11, 2004, neuropsychological evaluation indicated cognitive deficits. (R. 406.)

Unum referred Plaintiff's appeal to the Glendale, California office for a new review. RN Gary McCollum reviewed and summarized the medical evidence and concluded that "[i]t does not appear that [Plaintiff's] physical/neurological conditions are of significance to warrant R's and L's[5] that would preclude her from her usual work. It does appear that the bulk of the patient's complaints are of cognitive impairment causing inability to perform her work effectively . . . the physical conditions alone or combined, do not appear to support an inability to work." (R. 553.) The file was then reviewed by Dr. R. A. Hill, who concurred with McCollum's findings. He noted significant improvement by April 15, 2004, so there were no physical reasons for Plaintiff not to return to work. (R. 556.) Both McCollum and Dr. Hill deferred to a neurocognitive evaluation to assess any other impairment.

On June 16, 2005, Dr. Jana G. Zimmerman, a clinical neuropsychologist employed by Unum reviewed the medical records and other reports. In her report, Dr. Zimmerman stated that the testing showed some loss in cognitive function, but observed that the evaluation was performed in November 2004, almost seven months after Plaintiff stopped working and two months after the initial claim was denied. In contrast, Dr. Kumar's neurological exams near her date of disability indicated intact cognition despite [Plaintiff's] complaints of perception of cognitive

_____

[5] Restrictions and Limitations.

-14-

slowing on 4/14/04 and memory and speech on 5/21/04." (R. 564.) The testing itself was limited and repetitive, not a "comprehensive forensic neuropsychological evaluation, consistent with the clinical setting." Dr. Zimmerman found that the testing reflected "suboptimal performance" and gave as examples certain test scores which were so low that, if valid, would indicate a need for 24-hour care, and other tests on which there were inconsistent scores even though measuring "similar cognitive demands." Plaintiff's MMPI-2 score was "suggestive of a longstanding pattern of depressive, anxious and somatic symptoms in individuals who are usually passive and dependent as well as emotionally overcontrolled." Despite evidence of significant depression and recommendations for mental health treatment, Plaintiff did not seek psychiatric treatment.[6] Thus, the testing "did not provide support for restrictions and limitations related to cognitive functioning regardless of etiology." (R. 565.)

By letter dated July 25, 2005, Unum denied Plaintiff's disability and life waiver claim appeals. (R. 570.) The letter tracked the medical reviews and noted that Plaintiff's condition appeared to be resolving as of April 15, 2004. The denial letter noted that while Plaintiff's primary complaint was cognitive slowing related to Neurontin, no psychological testing had taken place before Plaintiff's last day of

_____

[6] The record does indicate that Plaintiff was taking Wellbutrin, an anti-depressant medication. Nevertheless, there is no indication as to who prescribed this medication, and, indeed, Plaintiff does not dispute that she was resistant to the recommendation of her doctors that she seek psychiatric treatment.

-15-

work. The letter further referenced the absence of neurological/cognitive deficits noted by Dr. Kumar, the conclusions of Dr. Zimmerman, and Plaintiff's failure to pursue recommended psychiatric treatment. (R. 570-76.)

The group policy under which Plaintiff was covered was issued by Unum to her former employer, Autumn. The LTD policy expressly grants Unum broad discretionary authority to determine benefit eligibility:

> When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.
>
> * * *
>
> In exercising its discretionary powers under the Plan, the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decisions will constitute final review of your claim by the Plan. Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), decides in its discretion that the applicant is entitled to them.

(R. 56; 80.)

To recover disability benefits, a claimant must submit "proof of claim" establishing that she is disabled and under the "regular care of a physician." The LTD policy defines "disability" as follows:

> You are disabled when Unum determines that:
>
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

-16-

* * *

You must be continuously disabled through your elimination period . . . .

Your elimination period is 90 days.

(R. 60). "Limited" means "what you cannot or are unable to do." (R. 82.) "Material and substantial duties" are "duties that are normally required for the performance of your regular occupation" and which "cannot be reasonably omitted or modified." (*Id.*) "Regular occupation" is defined as "the occupation you are routinely performing when your disability begins." (R. 83.) Benefits will not be awarded under the policy if one is "able to work in [her] regular occupation on a part-time basis but [she] choose[s] not to." (R. 65.) "Part-time basis" is defined as "the ability to work and earn between 20% and 80% of your indexed monthly earnings." (R. 82.)

The life policy provides for waiver of premiums if one is "disabled." Disability is defined differently, and more stringently, in the life policy:

You are disabled when Unum determines that:

- during the elimination period, you are not working in any occupation due to your injury or sickness; and

- after the elimination period [9 months], due to the same injury or sickness, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by training, education or experience.

(Def. Ex. B at 61.)

Coverage under both policies continues so long as one is entitled to receive benefits. Otherwise, coverage ends when employment ends. (Ex. A at 58; Ex. B at

-17-

54.)   That is, under both policies, one must be disabled when employment ends, and remain continuously disabled throughout the elimination period, to be entitled to receive benefits.

Plaintiff initiated the current action asserting a right to long-term disability benefits and waiver of premiums under the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendant filed a Motion for Summary Judgment on June 1, 2009 (docket no. 16). Plaintiff filed a Motion for Summary Judgment on July 1, 2009 (docket no. 19).  Briefing has been completed, and these motions are ready for a ruling.

## II.  DISCUSSION

### A.  Motions for Summary Judgment

Summary judgment is proper only when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56©.   A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting FED. R. CIV. P. 56(e)).

-18-

In making a determination on a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir. 1995). Mere allegations and denials, however, are insufficient to establish a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id.* at 251 (internal quotations and citations omitted). Thus, the moving party can bear its burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish its claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting). "[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## B. Standard of Review for Denial of ERISA Benefits

The applicable standard of review of the denial of benefits under an ERISA plan is well-settled. Where a plan administrator is granted discretionary authority to determine benefit eligibility or construe the terms of the plan, the denial of benefits must be reviewed for abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th

-19-

Cir. 1997). Under this deferential standard, an administrator's decision will not be disturbed as long as it is reasonable, even if this court would have come to a different independent conclusion. *Ellis*, 126 F.3d at 232. "Such a decision is reasonable if it is 'the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Id.* (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995)). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion" and "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)), *overruled by implication on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). A reviewing court must assess the reasonableness of the administrator's decision based on the facts known to the administrator at the time of the decision. *See, e.g., Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir. 1999).

The parties here agree that the Plan gives the administrator discretion to interpret the plan and to determine benefit eligibility; therefore the abuse of discretion standard is appropriate.[7] The Fourth Circuit has identified eight nonexclusive factors

---

[7] A recent United States Supreme Court decision does not change the method of review. In *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), the Court recognized that where the plan administrator both evaluates and pays benefits claims, the court must weigh such conflict of interest as a factor in determining whether there is an abuse of discretion. *See Glenn*, 128 S. Ct. at 2348. The weight given to this factor will vary, depending upon the facts of the benefit decision process and whether, for example, the insurance administrator has "a history of biased claims administration." *Id.* at 2351.

relevant to an abuse-of-discretion review of an administrator's decision to deny benefits: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000).[8]

"A fiduciary's conflict of interest, in addition to serving as a factor in the reasonableness inquiry, may operate to reduce the deference given to a

The Supreme Court's decision in *Glenn* illustrates (but does not mandate application of) the Sixth Circuit's "combination of factors" method of review. *Id.* The Fourth Circuit's approach differs from the Sixth Circuit in that it modifies the abuse of discretion standard according to a "sliding scale" based on the degree of the conflict of interest. *See, e.g., Ellis*, 126 F.3d at 233. Indeed, a more recent Fourth Circuit decision, post-*Glenn*, acknowledges that where a conflict of interest does exist, review is still under the "familiar abuse-of-discretion standard," and the conflict is only one factor to be considered in determining whether the plan's decision was reasonable. *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 355-56 (4th Cir. 2008).

[8] I confess that this listing of factors is not much help. Rather, I find more beneficial a recent unpublished opinion by a panel of the court to the effect that reasonableness is an open-ended inquiry that may consider the eight *Booth* factors, "*in addition to other relevant issues.*" *Donnell v. Met. Life Ins. Co.*, 165 Fed. Appx. 288, 295 n.6 (4th Cir. 2006) (emphasis added). The panel reconciled the two standards, simply viewing the *Booth* factors "as more particularized statements of the elements that constitute a 'deliberate, principled reasoning process' and 'substantial evidence' and of the reasons for applying a modified abuse of discretion standard of review."

-21-

discretionary decision of that fiduciary." *Id.* at 343 n.2. Where a conflict of interest is established, the deference afforded the fiduciary's decision "will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Ellis*, 126 F.3d at 233. "The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." *Id.*; *see Stup v. Unum Life Ins. Co. of Am.*, 390 F.3d 301, 307 (4th Cir. 2004) (applying a sliding-scale abuse of discretion review in conflict of interest cases; a court must apply less deference "to the degree necessary to neutralize any untoward influence resulting from the conflict").

### C. Analysis

Here, Plaintiff argues that the denial of her long-term disability benefits and life waiver of premiums was unreasonable and constituted an abuse of discretion because Unum: (1) failed to give proper weight to Plaintiff's evidence; (2) imposed "extra-contractual proof requirements" on Plaintiff, namely that she submit to cognitive testing that was performed contemporaneously with her last date worked; and (3) discounted considerable subjective evidence of disability and based its decision on its in-house neuropsychologist, thus demonstrating a conflict of interest.

Under the LTD policy here, Plaintiff must establish that she was disabled when she stopped working or during the 90-day elimination period. The record simply

-22-

does not support such a finding. Clearly the crux of Plaintiff's claim is the cognitive deficits she claimed to suffer as a result of her sickness or medication. Yet, other than her self-reported complaints regarding memory loss, cognitive slowing, and slurred speech, there is scant objective evidence before July 14, 2004, the last day of the elimination period. On the APS dated June 21, 2004, Dr. Kumar listed cognitive problems as the only reason Plaintiff could not work, yet she had never documented any such problems that she had observed before that date. The APS was clearly based on Plaintiff's own complaints, not on any clinical findings or test results.[9] Additionally, Dr. Kumar suggested tapering, or other alternatives to Neurontin but Plaintiff resisted her suggestions. (*See*, *e.g.*, R. 431.) Plaintiff also rejected any suggestion of a psychological component to her symptoms and, in fact, never sought mental health treatment though both her treating neurologist and neuropsychologist diagnosed some element of depression, and Dr. Kumar recommended treatment. (*See*, *e.g.*, R. 428; 412.)

The first documentation of any observed cognitive impairment was not until October 27, 2004, after the initial claim denial, and almost two months after the expiration of the 90-day elimination period. The first neuropsychological evaluation, moreover, was not performed until November 11, 2004. (R. 408.) Under the policy,

---

[9] As noted above, Dr. Kumar's sole statement on Plaintiff's limitations reads: "Patient reports that her pain is much improved on Neurontin, but has cognitive difficulties are a side effect and hence any job which would require mental thinking and judgment." (R. 43.)

Plaintiff had to be "continuously disabled" during the elimination period. There is simply not enough objective evidence of disability during this period. Before the APS report dated June 21, 2004, Dr. Kumar had never suggested any limitations on Plaintiff's ability to work. Plaintiff, moreover, even indicated on April 27, 2004, that she was ready to go back to work but that her employer would not allow her to do so because of concerns for patient safety. (R. 95.)

Plaintiff contends that Unum improperly required her to provide "objective evidence" and to undergo cognitive testing. The record does not support this argument. In fact, Unum's decision was based on all the evidence in the record at the time Plaintiff submitted her claim. The initial denial letter stated as much: "the current records do not document a functional deficit that would preclude you from work." (R. 363.) The letter further noted that Plaintiff's cognitive complaints were not supported by any "cognitive or functional ability testing in the file." (*Id.*) The letter did not impose any additional, or "extracontractual" requirements, as argued by Plaintiff, but merely addressed the evidence in the medical record upon which Unum based its decision. The burden of proof was on Plaintiff, not Unum, and the fact that there were no objective test findings was Plaintiff's responsibility. It was her burden to establish her disability through something more than her subjective complaints. The records from the relevant time period simply do not support the alleged cognitive deficiencies upon which Plaintiff's claim is predicated, nor do they support any medical problems so severe to prevent Plaintiff from performing her job. Unum did

-24-

not impose improper requirements on Plaintiff by simply informing her that the evidence in the record for the relevant time period was insufficient to support a finding of disability.[10]

Plaintiff's characterization of Dr. Zimmerman's assessment as "predictable" because she was an in-house neuropsychologist is unavailing. In fact, Dr. Zimmerman's report acknowledged that Plaintiff had some loss in cognitive function, as indicated in Dr. Naylor's November 2004 assessment, but, again, she observed that the evaluation was completed almost seven months after Plaintiff stopped working and two months after the initial denial. The purpose of the Naylor report was for evaluation of Plaintiff's current status and for further treatment recommendation, while obviously Dr. Zimmerman's review was related to the initial claim for benefits based on alleged disability as of the date Plaintiff stopped working. In fact, Dr. Zimmerman reviewed all the medical records in assessing Plaintiff's condition at the relevant time, from April 15, 2004, through the end of the elimination period. She noted Dr. Kumar's records, which "indicated intact cognition despite [Plaintiff's] complaints of perception of cognitive slowing on 4/14/04 and memory and speech on 5/21/04." (R. 564.) Dr. Zimmerman also noted inconsistencies in the test

---

[10] Plaintiff's argument that Unum had a duty to arrange for an independent medical examination is also misplaced. It is not the insurer's obligation to examine a plaintiff for potential disabling conditions when the burden of proof is on the claimant. *See Piepenhagen v. Old Dominion Freight Line, Inc.*, 640 F. Supp.2d 778, 792-93 (W.D. Va. 2009); *Lucy v. The Macsteel Serv. Ctr.*, 107 Fed. Appx. 318, 321 (4th Cir. 2004)

results reported by Dr. Naylor and noted that some of the tests performed by Dr. Naylor were "not comprehensive from a forensic neuropsychologist perspective."

Dr. Zimmerman's report did not simply defer to the initial decision; rather, she clearly considered the medical record, including additional records and reports that were not available in the initial decision. Her report was reasoned and based on the evidence of record regarding Plaintiff's condition. The fact that she disagreed with Dr. Naylor's assessment does not make Dr. Zimmerman's evaluation any less reliable, nor does it suggest an impermissible conflict of interest. It is not an abuse of discretion to deny benefits when conflicting medical reports exist. *See Nord*, 528 at 834 (holding that while a plan administrator cannot completely ignore a treating physician's opinion, courts may not "impose on plan administrators a discrete burden of explanation when they credit evidence that conflicts with a treating physician's evaluation.").

While it appears unquestionable that Ms. Nicely suffers from some impairment, there is legitimate disagreement as to the debilitating nature of her symptoms. Two physicians and a neuropsychologist reviewed her medical records and concurred that there was not substantial objective evidence of disabling symptoms during the relevant time period. Unum's decision simply came down to a permissible judgment call between conflicting medical opinions. Given the lack of objective evidence, the lack of restrictions placed on Plaintiff before her last day of employment, and the differing conclusions of Ms. Nicely's treating physicians from

-26-

those of Drs. Hill, Smith, and Zimmerman, Unum's denial of long-term disability benefits was reasonable and not an abuse of discretion. *See Booth*, 201 F.3d at 345 ("Confronted with this record of conflicting opinion, it was within the discretion of the Administrative Committee-indeed it was the duty of that body-to resolve the conflicts . . . ."); *Elliott*, 190 F.3d at 606 (holding that "it is not an abuse of discretion for a plan fiduciary to deny . . . benefits where conflicting medical reports were presented"); *Ellis*, 126 F.3d at 234 (finding no abuse of discretion where a treating physician's findings conflicted with an independent panel of medical specialists).

## III. CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment (docket no. 19) be **DENIED**, that Defendant's Motion for Summary Judgment (docket no. 16) be **GRANTED**, and that judgment be entered for Defendant.

_____
WALLACE W. DIXON
United States Magistrate Judge

Durham, NC
December 23, 2009